**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEUTSCHE FINANCE AMERICA LLC and DF TPC JvCo LLC, | |
| Petitioners, | Civil No. _____ |
| v. | **PETITION TO CONFIRM ARBITRAL AWARD** |
| BAYVK IMMOBILIEN-DACHFONDS 1 SCS SICAV-SIF SUBFONDS ELEKTRA 2 and 711 INVESTMENT S.C.S., | |
| Respondents. | |

Petitioners Deutsche Finance America LLC ("DFA") and DF TPC JvCo LLC hereby respectfully petition this Court pursuant to Section 207 of the Federal Arbitration Act, 9 U.S.C. § 207 (the "FAA"), and the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") for an order confirming an interim arbitral award issued on April 13, 2026 by Emergency Arbitrator Tony Cole in a JAMS arbitration bearing Reference No. 5425005454, and in support thereof respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      The underlying arbitration arose amidst a wealth of misconduct by Respondents. Stated simply, Germany's largest public pension fund, Bayerische Versorgungskammer ("BVK")—acting through Respondents BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2 ("Elektra 2") and 711 Investment S.C.S.—broke investment rules, squandered its $2 billion U.S. real estate portfolio, dissembled about its misconduct, and blamed its disfavored asset manager—DFA—for the fallout.

2.      Against that backdrop, BVK went to concerted, conspicuous lengths to evade its contractual obligations to DFA, thereby precipitating the arbitral award at issue.  The ultimate

issue in the underlying arbitration, now ongoing, is straightforward: whether BVK, acting through Respondents, has a legal basis for refusing to pay DFA the fees to which DFA is entitled under the terms of the parties' governing contract. Since 2018, BVK and Respondents have contracted with DFA to provide management services and support to BVK's U.S. real estate investments, including the iconic Transamerica Pyramid in San Francisco, California. In September 2024, BVK decided to restructure the fee arrangements across its portfolio, and in a September 2024 term sheet, DFA agreed to resign from providing management services to certain BVK assets and accept reduced aggregate fees. In exchange, DFA received fee protection for the roles it retained, including its role in providing management services for the Transamerica Pyramid: if DFA were terminated as an asset manager of the Transamerica Pyramid before December 31, 2028, it would be "entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred"—approximately $31.3 million.

3. That termination occurred on March 27, 2026, when BVK sold the Transamerica Pyramid. Consistent with an identical fee-protection arrangement that Respondents negotiated with DFA's co-manager, Michael Shvo, Respondents paid Mr. Shvo approximately $45 million when he was terminated from his role as asset manager in 2025. Yet Respondents have refused to pay DFA a single dollar. Still worse, on the eve of the Transamerica sale, Respondents went to inordinate lengths to cut off DFA from the monies owed to it—to the point of trying to circumvent and redesign the agreed transactional structure through which proceeds were meant to flow, all so DFA would have no ready recourse to recoup the fees it is owed post-transaction.

4. As a result, the parties are in an ongoing arbitration to resolve that fee dispute. At the outset of the arbitration, however, an emergency arbitrator issued an interim arbitral award that, by stipulation, preserves the proceeds of the Transamerica sale pending resolution of this

2

dispute by requiring the money to be held in place.  *See* Declaration of Derek L. Shaffer In Support Of Petition To Confirm Arbitral Award ("Shaffer Decl.") Ex. 1 (the Award).  Confirmation of that preservation order is critical to ensuring that DFA is able to recover the fees it is owed.  The Award falls within the ambit of the New York Convention and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA") because it was issued in a JAMS arbitration seated in New York, involves parties domiciled outside the United States, and concerns a commercial matter.

5.      There is no basis for refusing or deferring recognition and enforcement.  Courts routinely enforce interim awards that preserve assets to ensure that any final award will be meaningful.  Confirmation is mandatory and warranted under 9 U.S.C. § 207, and Petitioners are entitled to entry of an order confirming the Award.

## **PARTIES**

6.      Petitioner DFA is a Delaware limited liability company and the majority owned subsidiary of DF Deutsche Finance Holding AG ("DFG").  Established in 2018, DFA functions as DFG's investment and asset management platform for U.S. real estate: it sources, structures, and manages direct real estate investments in the U.S. on behalf of DFG's institutional client accounts and managed funds.

7.      Petitioner DF TPC JvCo LLC is a special purpose vehicle established by DFA that acts as the joint venture vehicle through which parties invested in the Transamerica Pyramid.

8.      Non-party Michael Shvo has served as DFA's co-asset-manager of the Transamerica Pyramid, acting through non-party BHSD Pyramid Management Company LLC.

9.      Respondent Elektra 2 is a closed-end special Alternative Investment Fund ("AIF") organized as société en commandite simple under the laws of Luxembourg.  It serves as the central vehicle through which BVK's capital is deployed for selected international real estate investments, including in the property at issue in this suit.

10.    Respondent 711 Investment S.C.S. is also a closed-end AIF organized as société en commandite simple under the laws of Luxembourg, which is currently in liquidation and through which Elektra 2 made certain real estate investments in the United States.

11.    Non-party BVK is a German public pension group and functions as an agency of the Free State of Bavaria, subordinate to the Bavarian State Ministry of the Interior.  BVK is the beneficial majority owner of the properties at issue in this suit.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. §§ 202 and 203 because this is a civil action seeking recognition and enforcement of an award rendered in an arbitration falling under the New York Convention.

13.    This Court has personal jurisdiction over the parties because at the April 1, 2026, preliminary conference, all parties agreed that the seat of the arbitration is New York, consented to arbitrate in New York, and have actively participated in the ongoing arbitration proceedings.

14.    Venue is proper in this judicial district pursuant to 9 U.S.C. § 204 because this petition seeks confirmation of an arbitration award made within this District.

## BACKGROUND

**A.    BVK Invests In U.S. Commercial Real Estate**

15.    BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals.  In the mid-2010s, BVK embarked on a multibillion-dollar push into international real estate.  By 2020, BVK had invested approximately $2 billion in seven U.S. properties that received management services from DFA and Mr. Shvo's organization.

16.    German and EU law set out a distinct framework for BVK's real-estate investments and related tax privileges.  Specifically, because BVK made its investments through regulated real-estate fund structures (so-called *Alternative Investment Funds* ("AIF")), responsibility for and

4

decision-making authority regarding all investment decisions was required to reside with the fund's external management (so-called *Alternative Investment Fund Manager* ("AIFM")), not with investors like BVK. This meant that BVK could only have a limited investor role and could not assume project-level steering functions without violating the regulatory restrictions under which it operates.

17.    BVK flouted those restrictions by, among other things, influencing investment structuring, making investment decisions, and driving operational strategy directly with its U.S. counterparties. BVK's own CEO would eventually admit in public that BVK employees had an "inappropriate close relationship" with parties in the U.S.[1] All the while, however, BVK acted incompetently and undermined and circumvented the regulated fund managers who were meant to exercise independent portfolio-management, risk-management, and oversight functions, directly causing the investments to significantly underperform.

### B.    BVK Contracts With DFA

18.    As part of BVK's investments, Respondents contracted with DFA and U.S. real-estate developer Michael Shvo in connection with the management and operation of their real estate assets. Through BHSD Pyramid Management Company LLC, DFA and Mr. Shvo thus served as the asset managers for BVK's U.S. properties.

19.    Until March 27, 2026, one of the properties that DFA provided management-related services and support for on behalf of BVK was the iconic Transamerica Pyramid in San Francisco, California. Respondents contracted with DFA and Mr. Shvo to serve as the Transamerica Pyramid's asset managers. In return for their management services, DFA and Mr. Shvo received

---

[1]    Jan Dams, *Es wird zu Verlusten kommen*, Welt am Sonntag (Ger.), Aug. 31, 2025, at 30.

contractually specified fees via a special purpose entity that was responsible for making the actual fee payments, BHSD Pyramid JVCo LLC.

### C.    BVK Causes Its Investments To Fail But Blames DFA

20.    BVK's U.S. investments for which DFA provided management-related services and support, including in the Transamerica Pyramid, did not go according to plan.  Instead, BVK's problems with German regulations and regulators appear to have led it, beginning at least as early as the start of 2024, to act underhandedly and even irrationally.  In particular, although BVK had improperly stepped into a steering role, it faltered in that role and systematically harmed its investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties.  Ultimately, BVK's obstruction, compounded by challenging economic conditions, led to substantial underperformance across its U.S. investment portfolio.  Total losses eventually reached an estimated €853 million.

21.    Then, because it was unable to disclose its own regulatory violations as the cause of its investment losses (and thereby face tax consequences), BVK pursued a sustained public campaign to shift blame onto DFA—misrepresenting to German authorities, the German press, and BVK's own 2.8 million pension beneficiaries that DFA bore responsibility for the portfolio's underperformance.  For instance, in a series of parliamentary inquiries in 2024 and 2025, the Bavarian State Ministry of the Interior, relying on information supplied by BVK, represented to the Bavarian Parliament that BVK played no operational role in the U.S. investments.  And on July 29, 2024, Abendzeitung München published an article containing non-public information

about DFA's internal personnel changes that mischaracterized DFA as "BVK's investment vehicle," and wrongly positioned BVK as a passive, aggrieved investor seeking an exit.[2]

### D.    BVK And DFA Enter Into The New Term Sheet

22.    In September 2024, Respondents, DFA and certain other parties entered into a new binding agreement—the "Term Sheet"—that restructured the fee arrangements across Respondents' portfolio, including for the Transamerica Pyramid. *See* Shaffer Decl. Ex. 2 (the Term Sheet).

23.    Under the Term Sheet, which BVK and Elektra 2 wrote, DFA agreed to voluntarily terminate its management services of certain assets in order to comply with BVK's request that it substantially reduce its aggregate portfolio fees.

24.    In exchange, however, DFA secured critical fee protection for its management services of the Transamerica Pyramid: if DFA's affiliate, BHSD Pyramid Managing Member LLC (the "Transamerica Managing Member"), was "terminated before December 31, 2028," which would in the ordinary course deprive DFA of its ability to collect fees, DFA would nonetheless "be entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred … and during such time DF shall be deemed a consultant entitled to be paid for such fees." Shaffer Decl. Ex. 2 at 5.

25.    Mr. Shvo and Respondents negotiated a term sheet identical to DFA's under which Respondents promised that, "[i]f the Transamerica Managing Member is terminated before December 31, 2028, then Shvo shall be entitled to receive … all fees that would have been payable to Shvo through December 31, 2028 had such termination not occurred … ."

---

[2] Alexander Spöri, *House of BVK: Millionen-Immobilienimperium aus deutschem Pensionsgeld fällt zusammen*, Abendzeitung München (Ger.), July 29, 2025.

26.     Thus, Mr. Shvo was entitled to materially the same management fees as DFA in the event of a termination.  All fees owed were to be paid first to BHSD Pyramid Management Company LLC, an entity which is owned equally by DFA and Mr. Shvo.

27.     In keeping with those terms, in February 2025, Respondents signed another agreement with Mr. Shvo providing that, in exchange for terminating his agreements relating to Transamerica, he would receive $45,063,452—largely and specifically for the fees that he was entitled to receive under the term sheet.  Mr. Shvo's termination left DFA as the sole asset manager entitled to all future management fees.

**E.      BVK And Respondents Scheme To Deny DFA The Fees It Is Owed**

28.     Approximately one year after entering into the Term Sheet, BVK and Respondents embarked on a multifaceted scheme to remove DFA from its role providing management services to the Transamerica Pyramid while reneging on the management fees guaranteed to DFA.

29.     First, on December 31, 2025, the date on which Mr. Shvo was removed, leaving DFA as the sole asset manager, BVK's counsel sent a letter to DFA demanding that it exit Transamerica and waive all management fees.  DFA refused.

30.     Second, just a few weeks later on January 27, 2026, Respondents—without consulting DFA—agreed on final terms of the Purchase and Sale Agreement (the "PSA") to sell the Transamerica Pyramid to Yoda USA Transamerica LLC.  This agreement was presented to DFA as fully negotiated and in fact had already been executed by the buyer.

31.     Under the parties' agreement, that sale would trigger DFA's entitlement to fees through 2028 because DFA would be removed from its role as asset manager and the Transamerica Managing Member would be terminated (as is standard in real estate transactions).  Indeed, the

PSA stated that upon closing, "any and all service contracts for the leasing, listing, brokerage, asset management[, and] property management" for the Transamerica Pyramid will be "terminate[d]."

32.     DFA's entitlement to its fees from the sale should have been straightforward, and the special purpose entity within the pre-sale Transamerica Pyramid ownership structure that was responsible for paying DFA's fees (BHSD Pyramid JVCo LLC) should have received sufficient sale proceeds to continue paying DFA's fees, as those would have become due (absent the sale) until the end of 2028.

33.     While that is how everything should have worked, Respondents sought to deprive DFA of every penny of its contractually guaranteed fees.

34.     In the weeks leading up to the sale closing, on February 4, 2026, Elektra 2 asked DFA and other relevant parties for consent to instruct the Transamerica Pyramid sale escrow agent to send the proceeds from the sale *around* BHSD Pyramid JVCo LLC, the entity that would have paid DFA.  DFA conspicuously did not provide such consent.  Rather, it stated that it would investigate the proposal and consented only to a draft flow of funds (which presumed that Respondents would comply with their fee payment obligations under the Term Sheet), while reserving judgment on the final flow of funds.

35.     Accordingly, DFA sent Elektra 2 a letter on February 27, 2026, demanding that Elektra 2 acknowledge the fees owed to DFA upon the sale of the Transamerica Pyramid and agree that the escrow agent would set aside DFA's fees upon closing to ensure DFA would receive them. Elektra 2 responded on March 9 (10 days later) by denying that DFA was due *anything,* making clear that it intended to use the proposed diversion of funds as a device for denying DFA all that it is owed—if the money did not pass through BHSD Pyramid JVCo LLC per the usual course, then DFA would have no way to collect its fees.

9

36.     In response to these tactics to deny DFA the fees to which it is clearly entitled, DFA promptly took measures to protect itself and preserve its rights.  It informed Respondents on March 20 that it did not consent to the diversion of funds and insisted that the funds be disbursed as required under the applicable operating agreements—and not diverted around the investment structure—to ensure that the majority of funds would flow through BHSD Pyramid JVCo LLC. DFA made clear over multiple emails and phone calls that it did not seek to preclude the closing of the Transamerica Pyramid sale; what DFA did oppose was any distribution of funds that would bypass the structure and leave DFA without recourse for recovering the fees owed to it under the Term Sheet.

37.     Respondents responded to these reasonable instructions by falsely accusing DFA of seeking to block the closing and threatening to bring spurious lawsuits against DFA's officers. Ultimately, Respondents relented and agreed that "the net sale proceeds [] be held by either BHSD Pyramid JVCo LLC or BHSD TPC PropCo LLC and not distributed to any party until there is an agreed-upon flow of funds between DF and 711 Investment S.C.S. or an order directing the disposition of the same."  The parties memorialized this agreement via email exchanges.

38.     BVK and Respondents' refusal to pay DFA the fees it is owed is all the more anomalous because it now appears that BVK and Respondents ostensibly have been making still more payments to Mr. Shvo—thereby reducing the ultimate investors' share of the Transamerica Pyramid sale proceeds.  To wit, the buyer of the property has publicly announced that, upon closing, BVK and Respondents paid Mr. Shvo $34 million to terminate his involvement with the property.  This appears to be an additional pay-out to Mr. Shvo, above and beyond the fees he was already paid, raising grave questions about the disclosures and decisions around the Transamerica sale, as well as the sufficiency of BVK's internal controls.

10

39.     The sale of the Transamerica Pyramid and associated properties closed on March 27, 2026.  Soon after closing, Respondents noticed their demand for arbitration and filed their request for emergency relief.

## ARBITRAL PROCEDURAL HISTORY AND AWARD

40.     The Term Sheet provides that the parties must resolve any disputes arising out of or relating to the Term Sheet through binding JAMS arbitration.  Specifically, the Term Sheet states that "[t]he parties shall resolve all disputes arising out of, concerning, or related to this Term Sheet, including but not limited to any dispute relating to the interpretation, performance, breach or termination of this Term Sheet … by binding arbitration administered by JAMS pursuant to the JAMS Comprehensive Arbitration Rules & Proceedings."  Shaffer Decl. Ex. 2 at 12.

41.     In accordance with that provision, on March 28, 2026, Respondents Elektra 2 and 711 Investment S.C.S. submitted to JAMS their Demand for Arbitration, including a Request for Emergency Relief, initiating the arbitration against Petitioners and other respondents. Respondents sought an emergency order restraining Petitioners from distributing or causing the distribution of the sale proceeds from the Transamerica Pyramid, pending adjudication of Respondents' claim that DFA is not entitled to approximately $31.7 million in management fees under the Term Sheet.  Respondents also sought a declaration that neither DFA nor any DFA-affiliated entity is entitled to fees under the Term Sheet.

42.     On March 30, 2026, the Emergency Arbitrator, Tony Cole, Esq., FCIArb, was appointed in accordance with the Emergency Relief Procedures in the JAMS Comprehensive Arbitration Rules and Procedures.

43.     On April 1, 2026, DFA submitted its Response to the Request for Emergency Relief, agreeing to the relief requested contingent on the order binding all parties—not only

11

Petitioners.  Respondents agreed with this clarification.  Also on April 1, 2026, a preliminary conference was held via videoconference, in which all parties participated.

44.    At the preliminary conference, the parties stipulated and agreed to the following matters, among others: (i) the seat of the arbitration is New York; (ii) the law governing the arbitration agreement is the Federal Arbitration Act, supplemented by Delaware law where appropriate; (iii) the applicable substantive law is Delaware law; (iv) all claims raised in the arbitration are arbitrable; (v) the Emergency Arbitrator has jurisdiction over all parties and claims; and (vi) all conditions precedent to arbitration have been satisfied.

45.    On April 10, 2026, Respondents submitted to the Emergency Arbitrator a proposed order for emergency relief, signed by all parties, which was adopted and incorporated into the Award.

46.    On April 13, 2026, the Emergency Arbitrator issued the Award—Procedural Order No. 1 (Stipulated and Agreed Order Governing the Release of Proceeds).  The Award provides, in relevant part, as follows:

(1)    "No Party shall take action to distribute the Proceeds, or to cause the Proceeds to be distributed, except as set forth in Paragraphs 2 and 3 below, or as otherwise may be ordered by the Emergency Arbitrator or the Arbitration Panel (when constituted)."  Shaffer Decl. Ex. 1 at 2.

(2)    "If and as confirmed in writing by counsel for [all relevant parties], the JV Property Owner [*i.e.*, BHSD Pyramid JVCo LLC] may pay from the Proceeds costs and expenses as agreed by [all relevant parties]."  *Id.*

(3)    "If and as confirmed in writing by counsel for [all relevant parties], the Proceeds may be transferred from the possession of the JV Property Owner

to a third-party to be held by that third-party in accordance with instructions to be provided by [all relevant parties]." *Id.* at 2-3.

47.     The Award is binding on all parties and remains in effect until released by an order of the full Arbitral Tribunal (to be appointed) or by a subsequent order of the Emergency Arbitrator. *See id.* at 3.

48.     On April 10, 2026, Petitioners filed their Response and Statement of Counterclaim in the underlying arbitration, asserting claims for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing.  Petitioners seek, among other things, a declaration that DFA is entitled to $31,384,061 in fees under the Term Sheet.

49.     As of the date of this Petition, the Proceeds remain held by BHSD Pyramid JVCo LLC, and Respondents continue to deny that DFA is entitled to the fees guaranteed under the Term Sheet—notwithstanding that Respondents paid DFA's co-manager, Mr. Shvo, materially identical fees under materially identical contractual provisions.

50.     Pursuant to 9 U.S.C. § 207, this Petition is timely brought within three years of the delivery of the Award to Petitioners.

51.     The Award has not been vacated, modified, or corrected by order of any court of competent jurisdiction and remains in full force and effect.

## COUNT ONE

### *(Recognition and Enforcement of the Arbitral Award)*

52.     Petitioners repeat and reallege paragraphs 1 through 51, as if fully set forth herein.

53.     Because the Award was entered in the United States and involves parties from countries other than the United States, the Award falls under the New York Convention and may be enforced in federal court. 9 U.S.C. §§ 202–203; *see Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997).

54.    The Award is final with respect to the matters it determines—namely, the preservation of the sale proceeds pending resolution of the parties' competing claims—and is ripe for confirmation.  *See Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007); *Adult Use Holdings Inc. v. FaZe Clan Inc.*, 631 F. Supp. 3d 174, 182 (S.D.N.Y. 2022); *Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*, 46 F. Supp. 3d 327, 337 (S.D.N.Y. 2014).  Indeed, courts in this district routinely confirm arbitral orders designed to secure funds for payment of the prevailing party.  *See Banco de Seguros del Estado v. Mut. Marine Offs., Inc.*, 230 F. Supp. 2d 362, 369-70 (S.D.N.Y. 2002) (collecting cases).

55.    Under the FAA, "any party to the arbitration may apply to any court having jurisdiction" for "an order confirming the award as against any other party to the arbitration."  9 U.S.C. § 207.  "The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  *Id.*

56.    No grounds exist for the Court to refuse or defer recognition or enforcement of the Award under the New York Convention or the FAA.  The Award was entered by consent of all parties, further eliminating any conceivable basis for vacatur.

57.    Pursuant to 9 U.S.C. § 207, Petitioners are entitled to a judgment confirming the Award.

## **RELIEF SOUGHT**

58.    Petitioners respectfully seek confirmation of the Award by way of a judgment.

59.    Petitioners seek such other and further relief as the Court deems proper, including, if applicable, an Order enjoining Respondents and all persons acting in concert with them from distributing, dissipating, transferring, or encumbering the Proceeds held by BHSD Pyramid JVCo LLC, pending final resolution of the underlying arbitration, except as provided in the Award.

**THEREFORE**, Petitioners respectfully request that this Court issue an order pursuant to 9 U.S.C. § 207 confirming the Award and entering a judgment in accordance with the Award and such other relief as the Court deems proper.

Respectfully submitted,

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Dated: May 4, 2026        By:   /s/ *Derek L. Shaffer*

Derek L. Shaffer
555 13th Street NW, Suite 600
Washington, DC 20004
Tel: (202) 538-8123
derekshaffer@quinnemanuel.com

Alex H. Loomis (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (202) 538-8393
alexloomis@quinnemanuel.com

Jonathan B. Oblak
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, NY 10016 Tel: (212) 849-7156
jonoblak@quinnemanuel.com

Alex Van Dyke (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 West 6th St, Suite 2010
Austin, TX 78701
Tel: (737) 667-6129
alexvandyke@quinnemanuel.com

***Counsel for Petitioners***

15