**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DEUTSCHE FINANCE AMERICA LLC and DF TPC JvCo LLC,<br><br>       Petitioners,<br><br>    v.<br><br>BAYVK IMMOBILIEN-DACHFONDS 1 SCS SICAV-SIF SUBFONDS ELEKTRA 2 and 711 INVESTMENT S.C.S.,<br><br>       Respondents. | Civil No. _____ |

---

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' PETITION TO CONFIRM ARBITRAL AWARD

---

Derek L. Shaffer
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, DC 20004
Tel: (202) 538-8123
derekshaffer@quinnemanuel.com

Jonathan B. Oblak
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, NY 10016
Tel: (212) 849-7156
jonoblak@quinnemanuel.com

Alex H. Loomis (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (202) 538-8393
alexloomis@quinnemanuel.com

Alex Van Dyke (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 West 6th St, Suite 2010
Austin, TX 78701
Tel: (737) 667-6129
alexvandyke@quinnemanuel.com

*Counsel for Petitioners*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ..............................................................................................................3

      A.     BVK Invests In U.S. Commercial Real Estate .........................................3

      B.     BVK Contracts With DFA......................................................................4

      C.     BVK Causes Its Investments To Fail But Blames DFA ..........................4

      D.     BVK And DFA Execute The Term Sheet.................................................5

      E.     BVK And Respondents Scheme To Deny DFA The Fees It Is Owed.....................6

            1.     The Transamerica Pyramid Sale Triggers DFA's Fees ...............6

            2.     Respondents Deny That DFA Is Owed Fees ..............................7

            3.     DFA Tries To Secure Its Fees...................................................8

      F.     Procedural History ................................................................................9

ARGUMENT....................................................................................................................10

I.     THE COURT HAS SUBJECT MATTER JURISDICTION UNDER THE NEW YORK CONVENTION AND THE FAA.........................................................................10

II.    THE AWARD MUST BE CONFIRMED UNDER THE FAA AND THE NEW YORK CONVENTION ....................................................................................................11

      A.     The Award Is Final and Ripe for Confirmation.......................................11

      B.     The Award Is Entitled to Judicial Deference And Is Not Subject to Vacatur, Nonrecognition, or Nonenforcement.........................................12

CONCLUSION.................................................................................................................13

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Adult Use Holdings Inc. v. FaZe Clan Inc.*,
  631 F. Supp. 3d 174 (S.D.N.Y. 2022)......................................................................................11

*Banco de Seguros del Estado v. Mut. Marine Offs., Inc.*,
  230 F. Supp. 2d 362 (S.D.N.Y. 2002).................................................................................11, 12

*Kerr-McGee Ref. Corp. v. M/T Triumph*,
  924 F.2d 467 (2d Cir. 1991)....................................................................................................11

*Metallgesellschaft A.G. v. M/V Capitan Constante*,
  790 F.2d 280 (2d Cir. 1986)....................................................................................................12

*Ottley v. Schwartzberg*,
  819 F.2d 373 (2d Cir. 1987)....................................................................................................11

*Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*,
  668 F.3d 60 (2d Cir. 2012)......................................................................................................12

*Sperry Int'l Trade, Inc. v. Israel*,
  689 F.2d 301 (2d Cir. 1982)....................................................................................................11

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
  484 U.S. 29 (1987)..................................................................................................................12

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
  126 F.3d 15 (2d Cir. 1997)......................................................................................................10

*Zeiler v. Deitsch*,
  500 F.3d 157 (2d Cir. 2007)....................................................................................................12

STATUTES

Federal Arbitration Act

  9 U.S.C. § 1.............................................................................................................................2

  9 U.S.C. § 10(a) ....................................................................................................................13

  9 U.S.C. § 201..................................................................................................................10, 11

  9 U.S.C. § 202......................................................................................................................10

9 U.S.C. § 203 .................................................................................................................10

9 U.S.C. § 207 .............................................................................................................3, 11

**OTHER AUTHORITIES**

Alexander Spöri, *House of BVK: Millionen-Immobilienimperium aus deutschem
  Pensionsgeld fällt zusammen* Abendzeitung München (Ger.), July 29, 2025 ...........................5

Jan Dams, *Es wird zu Verlusten kommen*,
  Welt am Sonntag (Ger.), Aug. 31, 2025 .................................................................................3

U.N. Convention on the Recognition and Enforcement of Foreign Arbitral
  Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3.............................................10, 11, 13

**PRELIMINARY STATEMENT**

Petitioners Deutsche Finance America LLC ("DFA") and DF TPC JvCo LLC, by and through their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, respectfully submit this memorandum in support of their Petition to Recognize and Enforce the Interim Arbitral Award issued on April 13, 2026 by Emergency Arbitrator Tony Cole, Esq., FCIArb, of JAMS (the "Petition").

The context of the underlying arbitration is fraught with Respondents' misconduct. Stated simply, Germany's largest public pension fund, Bayerische Versorgungskammer ("BVK")—acting through Respondents BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2 ("Elektra 2") and 711 Investment S.C.S.—broke investment rules, squandered its $2 billion U.S. real estate portfolio, dissembled about its misconduct, and blamed its disfavored asset manager—DFA—for the fallout.

Against that backdrop, BVK went to concerted, conspicuous lengths to evade its contractual obligations to DFA, thereby precipitating the arbitral award at issue. The ultimate issue in the underlying arbitration, now ongoing, is straightforward: whether BVK, acting through Respondents, has a legal basis for refusing to pay DFA the fees to which DFA is entitled under the terms of the parties' governing contract. Since 2018, BVK and Respondents have contracted with DFA to provide management services and support to BVK's U.S. real estate investments, including the iconic Transamerica Pyramid in San Francisco. In September 2024, BVK decided to restructure the fee arrangements across its portfolio. Pursuant to a term sheet the parties negotiated at this time (the "Term Sheet"), DFA agreed to resign from providing management services to certain BVK assets and accept reduced aggregate fees. In exchange, DFA negotiated for fee protection for the roles it retained, including its role in providing management services for the Transamerica Pyramid. The deal was straightforward: if DFA were terminated as an asset

1

manager of the Transamerica Pyramid before December 31, 2028, it would be "entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred"—approximately $31.3 million.

That termination occurred on March 27, 2026, when BVK sold the Transamerica Pyramid. Consistent with an identical fee-protection arrangement that Respondents negotiated with DFA's co-manager, Michael Shvo, Respondents paid Mr. Shvo approximately $45 million when he was terminated from his role as asset manager in 2025.  Yet Respondents have refused to pay DFA a single dollar.  Still worse, on the eve of the Transamerica sale, Respondents went to inordinate lengths to cut off DFA from the monies owed to it—to the point of trying to circumvent and redesign the agreed transactional structure through which proceeds were meant to flow, all so DFA would have no ready recourse to recoup the fees it is owed post-transaction.

As a result, the parties are in an ongoing arbitration to resolve that fee dispute.  At the outset of the arbitration, however, an emergency arbitrator issued an interim award (the "Award") that, by stipulation, preserves the proceeds of the Transamerica sale pending resolution of this dispute by requiring the money to be held in place.  *See* Declaration of Derek L. Shaffer In Support Of Petition To Confirm Arbitral Award ("Shaffer Decl.") Ex. 1.  That preservation order is critical to ensure that DFA is able to recover the fees it is owed.  Confirmation of the Award is important to ensure it is enforced and the funds are not transferred or dissipated.  The Award falls within the ambit of the New York Convention and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA") because it was issued in a JAMS arbitration seated in New York, involves parties domiciled outside the United States, and concerns a commercial matter. There is no basis for refusing or deferring recognition and enforcement—least of all where, as here, all parties stipulated to the Award's terms.  And courts routinely confirm awards that preserve assets to ensure that any

2

final award will be meaningful.  Thus confirmation is mandatory and warranted under 9 U.S.C. § 207, and Petitioners are entitled to entry of an order confirming the Award.

## BACKGROUND

### A.     BVK Invests In U.S. Commercial Real Estate

BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals.  In the mid-2010s, BVK embarked on a multibillion-dollar push into international real estate.  By 2020, BVK had invested approximately $2 billion in seven U.S. properties that received management services from DFA and real estate developer Michael Shvo.

German and EU law set out a distinct framework for BVK's real-estate investments and related tax privileges. Specifically, because BVK made its investments through regulated real-estate fund structures (so-called *Alternative Investment Funds* ("AIF")), responsibility for and decision-making authority regarding all investment decisions is required to reside with the fund's external management (so-called *Alternative Investment Fund Manager* ("AIFM")), not with investors like BVK.  Pursuant to these strictures, BVK could only have a limited investor role and could not assume project-level steering functions without violating the regulatory restrictions under which it operates.

BVK flouted those restrictions by, among other things, influencing investment structuring, making investment decisions, and driving operational strategy directly with its U.S. counterparties. BVK's own CEO would eventually admit in public that BVK employees had an "inappropriate close relationship" with parties in the U.S.[1]  All the while, however, BVK acted incompetently,

---

[1]   Jan Dams, *Es wird zu Verlusten kommen*, Welt am Sonntag (Ger.), Aug. 31, 2025, at 30.

undermining and circumventing at every turn the regulated fund managers who were meant to exercise independent portfolio-management, risk-management, and oversight functions.

**B.    BVK Contracts With DFA**

As part of BVK's U.S. real estate investment strategy, Respondents contracted with DFA and Michael Shvo through BHSD Pyramid Management Company LLC to serve as asset managers for BVK's U.S. properties.

Until March 27, 2026, one of the properties that DFA provided management-related services and support for on behalf of BVK was the iconic Transamerica Pyramid in San Francisco, California.  In return for their property management services, DFA and Mr. Shvo received contractually specified fees via a special purpose entity that was responsible for making the actual fee payments, BHSD Pyramid JVCo LLC.

**C.    BVK Causes Its Investments To Fail But Blames DFA**

BVK's U.S. investments, including in the Transamerica Pyramid, did not go according to plan.  Instead, BVK's problems with German regulations and regulators led it, beginning at least as early as the start of 2024, to act underhandedly and even irrationally.  In particular, although BVK improperly stepped into a steering role, it faltered in that role and systematically harmed its investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties.  Ultimately, BVK's obstruction, compounded by challenging economic conditions, led to substantial underperformance across its U.S. investment portfolio.  Total losses eventually reached an estimated €853 million.

Then, because it was unable to disclose its own regulatory violations as the cause of its investment losses (and thereby face tax consequences), BVK pursued a sustained public campaign to shift blame onto DFA—misrepresenting to German authorities, the German press, and BVK's

4

own 2.8 million pension beneficiaries that DFA bore responsibility for the portfolio's underperformance.

For instance, in a series of parliamentary inquiries in 2024 and 2025, the Bavarian State Ministry of the Interior, relying on information supplied by BVK, misrepresented to the Bavarian Parliament that BVK played no operational role in the U.S. investments. And on July 29, 2024, Abendzeitung München published an article containing non-public information about DFA's internal personnel changes that mischaracterized DFA as "BVK's investment vehicle" and wrongly positioned BVK as a passive, aggrieved investor seeking an exit.[2] These statements were false and defamatory.

### D.    BVK And DFA Execute The Term Sheet

In September 2024, Respondents, DFA and other parties entered into a new binding agreement—the "Term Sheet"—that restructured the fee arrangements across Respondents' portfolio, including for the Transamerica Pyramid. *See* Shaffer Decl. Ex. 2. Under the Term Sheet, DFA agreed to voluntarily terminate its management services of certain assets in order to comply with BVK's request that it substantially reduce its aggregate portfolio fees. In exchange, however, DFA secured critical fee protection for its management services of certain other assets, including the Transamerica Pyramid: if DFA's affiliate, the "Transamerica Managing Member," was "terminated before December 31, 2028," which would in the ordinary course deprive DFA of its ability to collect fees through the life of the agreement, DFA would nonetheless "be entitled to receive … ***all fees that would have been payable to DF through December 31, 2028 had such***

---

[2]  Alexander Spöri, *House of BVK: Millionen-Immobilienimperium aus deutschem Pensionsgeld fällt zusammen*, Abendzeitung München (Ger.), July 29, 2025.

***termination not occurred*** … and during such time DF shall be deemed a consultant entitled to be paid for such fees." Shaffer Decl. Ex. 2 at 5.

Mr. Shvo and Respondents negotiated a term sheet identical to DFA's under which Respondents similarly promised that "[i]f the Transamerica Managing Member is terminated before December 31, 2028, then Shvo shall be entitled to receive … all fees that would have been payable to Shvo through December 31, 2028 had such termination not occurred … ." Thus, Mr. Shvo was entitled to materially the same management fees as DFA in the event of a termination. All fees were to be paid first to BHSD Pyramid Management Company LLC, an entity which is owned equally by DFA and Mr. Shvo.

In keeping with these terms, in February 2025, Respondents signed another agreement with Mr. Shvo providing that, in exchange for terminating his agreements relating to Transamerica, he would receive $45,063,452—specifically for the "Asset Management," "Property Management," "Construction Management," and "Leasing Override" fees that he was entitled to receive under the term sheet. Mr. Shvo's termination left DFA as the sole asset manager entitled to all such future management fees.

### E.    BVK And Respondents Scheme To Deny DFA The Fees It Is Owed

About a year after entering into the Term Sheet, BVK and Respondents embarked on a multifaceted scheme to remove DFA from its role providing management services to the Transamerica Pyramid while reneging on the management fees guaranteed to DFA.

#### 1.    The Transamerica Pyramid Sale Triggers DFA's Fees

First, on December 31, 2025, the date on which Mr. Shvo was removed, leaving DFA as the sole asset manager, BVK's counsel sent a letter to DFA demanding that it exit Transamerica and waive all management fees. DFA refused.

6

Second, just a few weeks later on January 27, 2026, Respondents—without consulting DFA—agreed on final terms of an agreement (the "PSA") to sell the Transamerica Pyramid to Yoda USA Transamerica LLC.  This agreement was presented to DFA as fully negotiated, and in fact had already been executed by the buyer.  Under the parties' agreement, that sale would trigger DFA's entitlement to fees through 2028 because DFA would be removed from its role as asset manager and BHSD Pyramid Managing Member LLC (the "Transamerica Managing Member") would be terminated (as is standard in real estate transactions).  Indeed, the PSA stated that upon closing, "any and all service contracts for the leasing, listing, brokerage, asset management[, and] property management" for the Transamerica Pyramid would be "terminate[d]."

### 2.      Respondents Deny That DFA Is Owed Fees

Because the sale contemplated the termination of DFA's role as a property manager of the Transamerica Pyramid, DFA was manifestly entitled to "all fees that would have been payable to DF through December 31, 2028 had such termination not occurred" under the express terms of the Term Sheet.  But rather than honor their unambiguous contractual duties, Respondents schemed to deprive DFA of its bargained-for fees.

In the weeks leading up to the sale closing, on February 4, 2026, Elektra 2 (BVK's investment fund) asked DFA and other relevant parties for consent to instruct the Transamerica Pyramid sale escrow agent to send the proceeds from the sale *around* BHSD Pyramid JVCo LLC, the entity that ordinarily would have paid DFA its fees pursuant to the Term Sheet.  DFA did not provide such consent.  Rather, it stated that it would investigate the proposal, and consented only to a draft flow of funds (based on the assumption that its contractually owed fees would be paid), while reserving judgment on the final flow of funds.

Accordingly, DFA sent Elektra 2 a letter on February 27, 2026, demanding that Elektra 2 acknowledge the fees owed to DFA upon the sale of the Transamerica Pyramid and agree that the escrow agent would set aside DFA's fees upon closing to ensure DFA would receive them. Elektra 2 responded on March 9 (10 days later) by denying that DFA was due *anything,* making clear that it intended to use the proposed diversion of funds as a device for denying DFA what it is owed— if the money did not pass through BHSD Pyramid JVCo LLC per the usual course, then DFA would have no way to collect its fees.

### 3.    DFA Tries To Secure Its Fees

In response to these tactics to deny DFA the fees to which it is clearly entitled, DFA promptly took measures to protect itself and preserve its rights. It informed Respondents on March 20 that it did not consent to the diversion of funds and demanded that the funds be disbursed as required under the applicable operating agreements—and not diverted around the investment structure—to ensure that sale proceeds would flow through BHSD Pyramid JVCo LLC. DFA made clear over multiple emails and phone calls that it did not seek to preclude the closing of the Transamerica Pyramid sale; what DFA did oppose was any distribution of funds that would bypass the investment structure and leave DFA without recourse for recovering the fees owed to it under the Term Sheet.

Respondents responded to these reasonable instructions by falsely accusing DFA of seeking to block the closing and threatening to bring spurious lawsuits against DFA's officers. Ultimately, Respondents stood down and agreed that "the net sale proceeds [] be held by either BHSD Pyramid JVCo LLC or BHSD TPC PropCo LLC and not distributed to any party until there is an agreed-upon flow of funds between DF and 711 Investment SCS or an order directing the disposition of the same." The parties memorialized this agreement in email correspondence.

8

BVK and Respondents' refusal to pay DFA the fees it is owed is all the more anomalous because it now appears that BVK and Respondents ostensibly have been making still more payments to Mr. Shvo—thereby reducing the ultimate investors' share of the Transamerica Pyramid sale proceeds. The buyer of the property publicly announced that, upon closing, BVK and Respondents paid Mr. Shvo $34 million to terminate his involvement with the property. This appears to be an additional pay-out to Mr. Shvo, above and beyond the fees he was already paid, raising grave questions about the disclosures and decisions around the Transamerica sale, as well as the sufficiency of BVK's internal controls.

### F.    Procedural History

The sale of the Transamerica Pyramid and associated properties closed on March 27, 2026. Soon after closing, Respondents noticed their demand for arbitration and filed their request for emergency relief. Respondents sought an emergency order restraining Petitioners from distributing or causing the distribution of the sale proceeds from the Transamerica Pyramid pending adjudication of Respondents' claim that DFA is not entitled to approximately $31.7 million in management fees under the Term Sheet. Respondents also sought a declaration that neither DFA nor any DFA-affiliated entity is entitled to fees under the Term Sheet.

Emergency Arbitrator Tony Cole was appointed on March 30, 2026. On April 1, 2026, the parties held a preliminary conference and agreed on all foundational matters: the seat of the arbitration is New York; the governing law of the arbitration agreement is the Federal Arbitration Act, supplemented by Delaware law; the substantive law is Delaware law; all claims are arbitrable; the Emergency Arbitrator has jurisdiction over all parties; and all conditions precedent to arbitration are satisfied.

On March 31, counsel for DFA advised counsel for Respondents that DFA consented to the request for emergency relief, contingent on the parties clarifying that the request for emergency

9

relief would apply to all parties.  Counsel for Respondents agreed with this clarification.  With that clarification added, the requested emergency relief was entirely unopposed.

On April 10, 2026, Respondents submitted a proposed order signed by all parties, which the Emergency Arbitrator adopted.  On April 13, 2026, Emergency Arbitrator Cole issued the Award—Procedural Order No. 1, a Stipulated and Agreed Order Governing the Release of Proceeds.  The Award provides that no party may distribute or cause the distribution of the proceeds of the Transamerica sale except by written agreement of all parties' counsel, or by order of the Emergency Arbitrator or the Arbitration Panel.  *See* Shaffer Decl. Ex. 1.

On April 10, 2026, Petitioners filed their Response and Statement of Counterclaim, asserting a claim for a declaration that DFA is entitled to $31,384,061 in fees under the Term Sheet, breach of contract, and breach of the implied covenant of good faith and fair dealing.

## ARGUMENT

**I.    THE COURT HAS SUBJECT MATTER JURISDICTION UNDER THE NEW YORK CONVENTION AND THE FAA**

This Court has jurisdiction over this action because it is a civil action seeking recognition of an award rendered in an arbitration falling under the New York Convention.  *See* U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3; 9 U.S.C. §§ 201, 203.  The New York Convention is enforceable under the FAA, which provides federal district courts with subject matter jurisdiction over "[a]n action or proceeding falling under the Convention."  9 U.S.C. § 203.

The Convention applies to arbitral awards relating to commercial matters where at least one party is not a citizen of the United States.  9 U.S.C. § 202; *see also Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997) (arbitration awards are subject to the Convention when they involve parties domiciled or having their principal place of business

outside the enforcing jurisdiction).  Respondents Elektra 2 and 711 Investment S.C.S. are both organized under Luxembourg law and have their principal places of business outside the United States.  The Award concerns a commercial dispute over management fees arising from a real estate investment.  Subject matter jurisdiction is therefore established.

## II.    THE AWARD MUST BE CONFIRMED UNDER THE FAA AND THE NEW YORK CONVENTION

### A.    The Award Is Final and Ripe for Confirmation

The New York Convention and the FAA provide that United States courts "shall recognize arbitral awards [under the New York Convention] as binding" and enforce them according to the rules of procedure of the United States.  New York Convention, art. III; *see* 9 U.S.C. §§ 201, 207. Once a petitioner demonstrates that a final arbitral award exists, confirmation is mandatory and proceeds as a summary proceeding.  *See Ottley v. Schwartzberg*, 819 F.2d 373, 377 (2d Cir. 1987) ("[C]onfirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.") (citation omitted).

The Award is final with respect to the discrete issue it determines: the preservation and governance of the Transamerica Pyramid sale proceeds pending resolution of the parties' competing claims to those proceeds.  An award that finally and conclusively disposes of a separate, independent claim or issue may be confirmed even if it does not resolve all claims submitted to arbitration.  *See Adult Use Holdings Inc. v. FaZe Clan Inc.*, 631 F. Supp. 3d 174, 182 (S.D.N.Y. 2022) (citing *Kerr-McGee Ref. Corp. v. M/T Triumph*, 924 F.2d 467, 471 (2d Cir. 1991)).  Under this principle, "[t]emporary equitable orders calculated to preserve assets or performance needed to make a potential final award meaningful … are final orders that can be reviewed for confirmation and enforcement by district courts under the FAA." *Banco de Seguros del Estado v. Mut. Marine Offs., Inc.*, 230 F. Supp. 2d 362, 369 (S.D.N.Y. 2002) (citation omitted); *see Sperry*

11

*Int'l Trade, Inc. v. Israel*, 689 F.2d 301, 303-04 (2d Cir. 1982) (affirming district court's confirmation of arbitral award "ordering that the proceeds of the letter of credit be held in an escrow account" pending adjudication of the merits).  Indeed, courts in this district routinely confirm arbitral orders designed to secure funds for payment of the prevailing party.  *See Banco de Seguros*, 230 F. Supp. 2d at 369-70 (collecting cases).

The Award here resolves a discrete issue—the governance of the Transamerica sale proceeds pending resolution of the arbitration—with finality, and does not require any further arbitral action to take effect.  It "require[s] specific action" by the parties, prohibiting them from distributing the proceeds except as specified in the order until the arbitration concludes.  *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007).  That ruling has "'finally and conclusively disposed of a separate and independent claim'" of the arbitration and "therefore 'may be confirmed although [it] do[es] not dispose of all the claims that were submitted.'"  *Id.* (quoting *Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 283 (2d Cir. 1986)).

The Award's status as a stipulated order reinforces its finality.  All parties signed the proposed order.  The Emergency Arbitrator adopted it without modification.  It is binding on all parties by its own terms and remains in effect until superseded by an order of the full Arbitral Tribunal or the Emergency Arbitrator.

**B.      The Award Is Entitled to Judicial Deference And Is Not Subject to Vacatur, Nonrecognition, or Nonenforcement**

"A court's review of an arbitration award is … 'severely limited'" and "not an occasion for *de novo* review."  *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012).  Courts "are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract."  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987).

12

That standard of deference is all the more warranted here. The Award does not reflect the arbitrator's contested resolution of a disputed issue; it reflects the agreed resolution of all parties, adopted by the arbitrator. Having invited the Award, Respondents cannot now challenge it. And even if they could, there is no ground to refuse enforcement under either the New York Convention or the FAA. *See* New York Convention, art. V; 9 U.S.C. § 10(a).

## CONCLUSION

For the foregoing reasons, the Court should enter an order confirming the Award and granting such other relief as the Court deems just and proper, including any relief necessary to preserve the proceeds of the sale of the Transamerica Pyramid pending final resolution of the underlying arbitration.

Respectfully submitted,

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Dated: May 4, 2026             By:  /s/ *Derek L. Shaffer*

Derek L. Shaffer
555 13th Street NW, Suite 600
Washington, DC 20004
Tel: (202) 538-8123
derekshaffer@quinnemanuel.com

Alex H. Loomis (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (202) 538-8393
alexloomis@quinnemanuel.com

Jonathan B. Oblak
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, NY 10016 Tel: (212) 849-7156
jonoblak@quinnemanuel.com

Alex Van Dyke (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
300 West 6th St, Suite 2010
Austin, TX 78701
Tel: (737) 667-6129
alexvandyke@quinnemanuel.com

*Counsel for Petitioners*

14

**CERTIFICATE OF WORD COUNT**

The undersigned hereby certifies that the foregoing brief complies with Local Rule 7.1(c) for this brief not to exceed 8,750 words.

Dated: May 4, 2026

/s/ *Derek L. Shaffer*
Derek L. Shaffer

15